EDMUND G. BROWN JR. Attorney General DANIEL G. STONE Deputy Attorney General
THE HONORABLE LOIS WOLK AND ROBERT DUTTON, MEMBERS OF THE STATE SENATE, have requested an opinion on the following three questions:
1. Are the payments required to be made by redevelopment agencies to affected taxing entities pursuant to Health Safety Code sections33607.5(c) and 33607.5(d) calculated by applying the tax rate to the difference between the assessed value of property in the redevelopment project area for the fiscal year in which the payment is made and the assessed value of property in the redevelopment project area for the adjusted base year, as established by the applicable subdivision of the statute?
2. Are the payments required to be made by redevelopment agencies to affected taxing entities pursuant to Health Safety Code section33607.7(b)(2) calculated by applying the tax rate to the difference between the assessed value of property in the redevelopment project area for the fiscal year in which the payment is made and the assessed value of property in the redevelopment project area for the adjusted base year, as established by the applicable subdivision of the statute? *Page 2 
3. If the answer to the above questions is yes, should the assessed value of property in the adjusted base year and the current year be based on the assessed value as set forth on the local assessment roll, or should it be affected by the agency's receipt of revenues from other sources, including but not limited to supplemental revenues, escape assessments, unitary taxes, redemption payments, penalties, and refunds?
 CONCLUSIONS
1. Yes, the "pass-through payments" required of a redevelopment agency under Health Safety Code sections 33607.5(c) and 33607.5(d) for a given ("current") fiscal year are to be calculated as those subdivisions expressly direct: namely, as a percentage of the product derived by applying the tax rate to the amount of assessed value by which (1) the current year assessed value of property in the redevelopment project area exceeds (2) the assessed value of property in the redevelopment project area in the designated adjusted base year.
2. Yes, the "pass-through payments" required of a redevelopment agency under Health Safety Code section 33607.7(b)(2) for a given ("current") fiscal year are to be calculated as that subdivision expressly directs: namely, as a percentage of the product derived by applying the tax rate to the amount of assessed value by which (1) the current year assessed value of property in the redevelopment project area exceeds (2) the assessed value of property in the redevelopment project area in the designated adjusted base year.
3. In applying Health Safety Code sections 33607.5(c), 33607.5(d), and 33607.7(b)(2), the assessed value of property in the redevelopment project area, whether for the "current year" or for an "adjusted base year," is determined by reference to the last equalized county assessment roll as defined in Revenue and Taxation Code sections 2050 through2055; matters not included in that roll are not germane to the determination.
 ANALYSIS
These questions concern payments — commonly referred to as "statutory pass-through payments" — that redevelopment agencies are required to make to certain other governmental bodies ("taxing entities") pursuant to legislation[1] enacted as part of the Community Redevelopment Law Reform Act of 1993.[2] The questions stem from *Page 3 
disagreements between redevelopment agencies and county auditors about the proper methodology for calculating payment amounts under the governing statutes. We begin our discussion with a brief overview of redevelopment agencies, the funding of redevelopment projects, and the origin and purpose of statutory pass-through payments.
The Community Redevelopment Law[3] was adopted in 1951, and a related provision was added to the California Constitution in 1952 following approval by the voters.[4] This set of laws provides for the formation of redevelopment agencies, whose mission is "to prepare and effectuate [redevelopment plans] for the elimination of blighted areas in the community."[5] Redevelopment projects are funded through "tax increment financing,"[6] a process recently described by our state Supreme Court as follows:
 Under tax increment financing, "[a]ll taxable property within the area to be redeveloped is subject to ad valorem property taxes. The properties lying within a redevelopment area have a certain assessed value as of the date a redevelopment plan ordinance is adopted. A local taxing agency, such as a city or county, continues in future years to receive property taxes on the redevelopment area properties, but may only claim the taxes allocable to the base year value. If the taxable properties within the redevelopment area increase in value after the base year, the taxes on the increment of value over and above the base year value are assigned to a special fund for the redevelopment agency.
 Once the redevelopment plan is adopted, the redevelopment agency may issue bonds to raise funds for the project. As the renewal and redevelopment is completed, the property values in the redevelopment area are expected to rise. The taxes attributable to the increase in assessed value above the base year value are assigned to the redevelopment agency, which then uses the funds to retire the bonds. The local taxing agencies still receive taxes attributable to the base year assessed value of the properties within the redevelopment area. This way, the redevelopment project in *Page 4 
effect pays for itself.[7]
Not all tax increment revenue is retained by redevelopment agencies, however.[8] Twenty percent of it must go to "a separate Low and Moderate Income Housing Fund," which is used "for the purposes of increasing, improving, and preserving the community's supply of low-and moderate-income housing."[9]
In addition, because the Legislature has determined that redevelopment plans typically result in new costs to "taxing entities" — that is, to the governmental agencies that derive property tax revenue from property located within a redevelopment project area — it has allocated a portion of tax increment revenues to those "affected local taxing entities," by way of pass-through payments, to address these financial burdens:
 The pass-through legislation requires redevelopment agencies to share or pass-through a portion of the property tax increment to affected local taxing entities, including schools. The Legislature declared [sic: that] pass-through payments are "necessary . . . to alleviate the financial burden and detriment that affected taxing entities may incur as a result of the adoption of a redevelopment plan, and payments made pursuant to this section will benefit redevelopment project areas." (§ 33607.5, subd. (f)(1)(A).)[10]
We note that the calculation of local property taxes and the allocation of property tax revenues among competing local governmental agencies are matters of considerable *Page 5 
complexity and frequent litigation.[11] Tax increment calculations and the proper distribution of pass-through payments may also involve complicated issues and sharp differences of opinion.[12] We emphasize, however, that our focus in this opinion is relatively narrow, and that our task is straightforward. We are asked only to interpret three statutes providing formulas to calculate a redevelopment agency's pass-through payments — sections 33607.5(c), [13] 33607.5(d), [14] and 33607.7(b)(2)[15] — and to clarify the factors involved in these calculations. *Page 6 
Our construction of these subdivisions is governed by well established rules of statutory interpretation. We must ascertain the Legislature's intent so as to effectuate the law's purpose, [16] examining the words used by the Legislature and giving them their usual and ordinary meaning.[17] We should avoid a construction that would make any of the statute's words redundant or superfluous, [18] and we may not read into the statute language that is not included in the text.[19] Where there is ambiguity, we may also consider "extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, *Page 7 
the legislative history, public policy, contemporaneous administrative construction, and the statutory scheme of which the statute is a part."[20] And we must avoid interpretations that would be patently unreasonable or would lead to "absurd consequences."[21]
Question One: Calculating Payments Under Sections 33607.5(c) and 33607.5(d)

The pass-through requirements of section 33607.5 apply to redevelopment project areas adopted on or after January 1, 1994, and to earlier project areas to which new territory is added after that date by amendment of the redevelopment plan.[22] Section 33607.5 provides three distinct formulas, or "tiers," for calculating the amount of an agency's pass-through payments in any given year, and each tier begins with a different base year. Each formula is applied only to the remainder of the agency's designated tax increment revenues after the amounts deposited in the Low and Moderate Income Housing Fund have been deducted.[23] Also, the payments are cumulative. Thus, for example, an agency that has received tax increments from a given redevelopment project for 31 years would be subject to all three formulas simultaneously, and its annual pass-through obligations would be the sum of the three resulting amounts. Following is a brief overview of how these tiers operate:
 Tier One (§ 33607.5(b)): This payment applies throughout the tax-increment period, from "the first fiscal year in which the agency receives tax increments . . . through the last fiscal year [in which it does so]," and equals "25 percent of the tax increments received by the agency" after deduction of the agency's deposit to the housing fund.
 Tier Two (§ 33607.5(c)): This required pass-through payment begins in "the 11th year in which the agency receives tax increments" and continues through the last fiscal year in which it does so. It equals "21 percent of the portion of tax increments received by the agency" (after deducting any housing fund deposit), as calculated "by applying the tax rate against the amount of assessed value by which the current year assessed value exceeds the . . . assessed value of the project area in the 10th fiscal *Page 8 
year in which the agency receives tax increment revenues." This 10th-year measure is labeled the "first adjusted base year assessed value."
 Tier Three (§ 33607.5(d)): This payment begins with "the 31st year in which the agency receives tax increments" and continues through the last fiscal year in which it does so. It equals "14 percent of the portion of tax increments received by the agency" (after deducting any housing fund deposit), as calculated "by applying the tax rate against the amount of assessed value by which the current year assessed value exceeds the . . . assessed value of the project area in the 30th fiscal year in which the agency receives tax increments." This 30th-year measure is labeled the "second adjusted base year assessed value."
Under these formulas, the multiplier obviously gets smaller with each new tier, dropping from 25 percent (tier one) to 21 percent (tier two) to 14 percent (tier three).[24] But in addition, as the foregoing summary shows, the tier-one formula differs from the other two in its description of the multiplicand — i.e., the figure that is to be multiplied by the applicable percentage rate. For tier one, the multiplicand is described simply in terms of revenue, as "the tax increments received by the agency," while for tiers two and three, it is described as a difference
in assessed value: namely, "the amount of assessed value by which the current year assessed value exceeds the . . . [first and second, respectively] . . . adjusted base year assessed value."
This difference in the language that is used to describe the multiplicands (between tier one, on the one hand, and tiers two and three on the other) is at the center of current disagreements about the proper calculation of an agency's pass-through payments, and it is the basis of Questions 1 and 2. Is this difference in statutory terminology intended to convey a different focus and methodology for second-tier and third-tier calculations, as redevelopment agencies contend, or is it merely a semantic variation, intended to describe the identical "tax increments received" methodology set forth for the first tier, as some county auditors maintain? If the Legislature intended to treat these words as distinct terms of art, has it clearly defined them somewhere in the statutes? That is, how, exactly, does one determine the "assessed value" of a project area in a given year; and how does that figure compare to "the tax increments received by the agency"?[25] While such *Page 9 
questions might be highly debatable in the abstract, in this case we believe that the Legislature has made the answers relatively plain.
The pertinent maxim of statutory construction for this kind of inquiry holds that "when the Legislature uses a critical word or phrase in one statute, the omission of that word or phrase in another statute dealing with the same general subject generally shows a different legislative intent."[26] To be sure, there may be some situations in which varying words or phrases are intended to convey the same thing, or in which "the Legislature's failure to use identical language in various statutory provisions was neither intentional nor meaningful."[27] But that is not the case here. Any suggestion that the Legislature intended to equate "the tax increments received by the agency," on the one hand, with a difference in "assessed values" between the current year and an adjusted base year, on the other, is rendered untenable, we think, by the Legislature's characterization of this latter measure as being only a "portion of tax increments received by the agency."[28] A "portion" of something is not the same as the whole, and the "portion" to which sections 33607.5(c) and 33607.5(d) apply is defined as the difference between assessed values of properties in the project area at two different times.
We therefore conclude, in answer to Question One, that the pass-through payments required of a redevelopment agency under sections 33607.5(c) (tier two) and 33607.5(d) (tier three) should be calculated as those subdivisions expressly direct: namely, by applying the tax rate to the difference between the assessed value of property in the redevelopment project area for the fiscal year in which the payment is made and the assessed value of property in the redevelopment project area for the relevant adjusted base year. *Page 10 
Question Two: Calculating Payments under Section 33607.7(b)(2)
Section 33607.7(b) applies to redevelopment project areas that were adopted before January 1, 1994, and were amended after that date in any of the respects specified in section 3607.7(a).[29] Absent a pre-existing agreement between the redevelopment agency and the affected taxing entities, section 33607.7(b)(2) requires an agency that has adopted a triggering amendment to thereafter make the following annual pass-through payments to the affected taxing entities:
 [T]he amounts required pursuant to subdivisions (b), (c), (d), and (e) of Section 33607.5, until termination of the redevelopment plan, calculated against the amount of assessed value by which the current year assessed value exceeds an adjusted base year assessed value.[30]
The "adjusted base year assessed value" is defined in section 33607.7(c) as "the assessed value of the project area in the year in which the limitation being amended would have taken effect without the amendment." (This point in time — that is, the year in which the amended limitation would otherwise have taken effect — thus begins the agency's pass-through responsibility, with payments commencing "in the first fiscal year following the fiscal year in which the adjusted base year value is determined.")[31]
Thus, as with sections 33607.5(c) and 33607.5(d), the multiplicand for calculating pass-through payments under section 33607.7(b)(2) is described not as a simple revenue amount[32] but as a difference
between assessed values: here, "the amount of assessed value *Page 11 
by which the current year assessed value exceeds an adjusted base year assessed value."[33] The Legislature has provided, in essence, asubstitute multiplicand to be used, along with the tax rate, in calculating pass-through payments for projects that have been amended in any of the ways listed in section 33607.7(a). This substitute multiplicand applies not only to tier-two and tier-three payments for these amended redevelopment plans, but to their tier-one payments as well. This is so because section 33607.7(b)(2) expressly provides that "the amounts required pursuant to subdivisions (b), (c), [and] (d)" of section 33607.5 (that is, all three tiers) be "calculated against" thissubstitute multiplicand — meaning (1) that the original multiplicands provided in those subdivisions of section 33607.5 are immaterial in this context, and (2) that the term "amounts" here refers narrowly to thepercentage multipliers specified in subdivisions (b), (c), and (d): that is, to 25 percent, 21 percent, and 14 percent, respectively.[34]
The statute may not be a model of clarity in this regard, but we are persuaded that the foregoing interpretation is far more reasonable than are proffered alternative readings, [35] that it is consistent with the usual and ordinary meaning of the words used, and that it is consistent with the Legislature's apparent intent to restrict an agency's pass-through obligations in these situations to post-amendment increases in the amended projects' assessed values.[36]
Taken together, then, sections 33607.7(b)(2) and 33607.7(c) establish the following three-tiered structure of pass-through payments governing the amended plans described in section 33607.7(a): *Page 12 
 Tier One's payment is required throughout the pass-through period, from the fiscal year following "the year in which the limitation being amended would have taken effect without the amendment" until "termination of the redevelopment plan," and equals 25 percent of the product calculated by applying the tax rate against the relevant section 33607.7(b)(2) multiplicand[37] (after deduction of the agency's deposit to the housing fund).
 Tier Two's payment obligation begins with the 11th year after the adjusted base year (that is, "the year in which the limitation being amended would have taken effect without the amendment") and continues until termination of the redevelopment plan. It equals 21 percent of the product calculated by applying the tax rate against the relevant section 33607.7(b)(2) multiplicand[38] (after deduction of the agency's deposit to the housing fund).
 Tier Three's payment obligation begins with the 31st year after the adjusted base year (that is, "the year in which the limitation being amended would have taken effect without the amendment") and continues until termination of the redevelopment plan. It equals 14 percent of the product calculated by applying the tax rate against the relevant section 33607.7(b)(2) multiplicand[39] (after deduction of the agency's deposit to the housing fund). *Page 13 
We therefore answer Question Two in the affirmative, concluding that the "pass-through payments" required of a redevelopment agency under section 33607.7(b)(2) for a given fiscal year are to be calculated as that subdivision expressly directs: namely, as a percentage of the product derived by applying the tax rate to the amount of assessed value by which (1) the assessed value of property in the redevelopment project area for that given "current" year exceeds (2) the assessed value of property in the redevelopment project area for the designated adjusted base year.
Question Three: Defining "The Assessed Value of Property in theRedevelopment Project Area"
Having determined that a redevelopment agency's pass-through payments under sections 33607.5(c), 33607.5(d), and 33607.7(b)(2) are not a direct function of the "tax increments received by the agency," as in section 33607.5(b), but are instead based on a portion of that amount attributable to differences in assessed property values over time, we now reach the final question. Question Three asks us to determine the proper measure of these respective assessed property values. More specifically, we are asked whether official assessment rolls are the sole source for such figures, or whether the statutes contemplate the inclusion of additional sources. We will conclude that, for these purposes, the "assessed value" of property within a redevelopment project is determined by reference to the last equalized assessment roll for the period in question.
The statutes in question, sections 33607.5(c), 33607.5(d), and 33607.7(b)(2), nowhere specifically define the term "assessed value," which is used in the phrases "current year assessed value," "adjusted base year assessed value," and "assessed value of the project area." In another part of the Community Redevelopment Law, however — section 33670(a) — the Legislature defines a phrase very similar to section 33607.5's "assessed value of the project area": namely, "the assessed value of the taxable property in the redevelopment project." The "total sum" of the project's "assessed value" is there defined as the amount "shown upon the assessment roll used in connection with the taxation of that property by the taxing agency, last equalized prior to the effective date of the ordinance."[40] *Page 14 
By its very nature the county assessment roll is the most logical database from which to ascertain the assessed value of property within the county.[41] For this reason, as well as the similarity of the respective phrases in sections 33670 and 33607.5, it is reasonable to infer that the Legislature means the same thing in both provisions. We therefore conclude that, for purposes of measuring a redevelopment agency's pass-through payment amounts under sections 33607.5(c), 33607.5(d), and 33607.7(b)(2), the positive changes in "assessed value" in each case (that is, the amounts by which the "current year assessed value exceeds the . . . adjusted base year assessed value") are calculated by comparing the last equalized assessment rolls for the project's property in the two specified years.[42] Accordingly, those factors that are included in the county's last equalized assessment rolls will influence the pass-through calculations, and those items not included in the rolls will not.
But what exactly does an assessment roll include? The contents of a county's local assessment roll are enumerated in section 602
of the Revenue and Taxation Code.[43] *Page 15 
For our purposes, however, we find clearer and more direct guidance in sections 2050 through 2055 of that code, where the Legislature has defined the meaning of "the `last equalized county assessment roll' in those words or in similar words, or in any words intended to refer to the latest or current assessment roll of the county."[44] This definition applies in a wide variety of contexts, including "the State Constitution, any law, any charter of a city or a county, or any ordinance, resolution, order or regulation of any city, county or other public corporation."[45]
Revenue and Taxation Code section 2051 provides very simply that "[t]he last equalized roll means the entire assessment roll as defined in Section 109." And section 109 states, among other things, that this roll includes both the "local roll" and the "board roll," and both the "secured roll" and the "unsecured roll," as those terms are defined.[46]
Section 2052 then provides in pertinent part that:
 The local roll . . ., including any changes made by the county board during the month of July, together with the board roll . . ., and the estimate with any changes transmitted . . ., shall become the last equalized roll on August 20, and such rolls together shall continue to be the last equalized roll, except as otherwise provided in this chapter, . . . [for all purposes], until the assessment roll for the following year becomes the last equalized roll in accordance with the provisions of this section.[47]
The phrase "except as otherwise provided in this chapter," in turn, refers to possible subsequent changes stemming from either (1) actions taken by a county board of equalization or an assessment appeals board to resolve locally disputed assessments, [48] or (2) actions taken by the state board of equalization to resolve challenges to state *Page 16 
assessments of publicly owned property within the county.[49] In the latter case, the state board's changes establish an amended "last equalized roll" when the county auditor receives notice of the board's action;[50] in the former case, an amended "last equalized roll" occurs on the third day after adjournment of the county board of equalization or of all the county's assessment appeals boards.[51]
Accordingly, we conclude that the operative measure for purposes of determining changes in assessed value over time, as required under sections 33607.5(c), 33607.5(d), and 33607.7(b)(2), is the roll most recently equalized before each measurement is taken, [52] and that matters not included in those rolls are not germane to that determination.
[1] Health Saf. Code §§ 33607.5 and 33607.7. All further references to the Health and Safety Code are by section number only.
[2] 1993 Stat. ch. 942 (Assembly 1290).
[3] §§ 33000-33855.
[4] See Cal. Const. art. XVI, § 16 (formerly art. XIII, § 19).
[5] Marek v. Napa Community Redevelopment Agency, 46 Cal. 3d 1070, 1082
(1988); see §§ 33100, 33131.
[6] See Cal. Const. art. XVI, § 16; Health Saf. Code § 33670;City of Dinuba v. Co. of Tulare, 41 Cal. 4th 859, 866 (2007); Los AngelesUnified Sch. Dist. v. Co. of Los Angeles, 181 Cal. App. 4th 414,421-422 and n. 4 (2010).
[7] City of Dinuba, 41 Cal. 4th at 866 (quoting Redevelopment Agencyv. Co. of Los Angeles, 75 Cal. App. 4th at 71, and citing RedevelopmentAgency v. Co. of San Bernardino, 21 Cal. 3d 255, 259 (1978), and § 33670et seq.).
[8] In addition to revenue generated by the taxation of incremental growth in assessed property values within their redevelopment projects, redevelopment agencies may also receive other forms of revenue in any given year — flowing from, for example, separately calculated supplemental, remedial, punitive, or interim assessments. See, e.g., Rev. Tax. Code § 75.11 et seq. (supplemental revenues); Rev. 
Tax. Code §§ 531-532 (escape assessments); Rev. Tax. Code §§ 100,723, 755-756 (unitary taxes); Rev. Tax. Code §§ 502-506, 531-531.6 (penalties and interest); see also Community RedevelopmentAgency v. Bloodgood, 182 Cal. App. 3d 342, 344-346 (1986) (agency entitled to share in revenue from delinquency penalties, interests, and redemption penalties).
[9] § 33334.3(a); see §§ 33334.2, 33334.6.
[10] Los Angeles Unified Sch. Dist., 181 Cal. App. 4th at 422.
[11] E.g., Los Angeles Unified Sch. Dist., 181 Cal. App. 4th 414;Co. of Sonoma v. Commn. on State Mandates, 84 Cal. App. 4th 1264
(2000).
[12] E.g., Community Dev. Commn. v. Co. of Ventura,152 Cal. App. 4th 1470 (2007); Redevelopment Agency v. Co. of LosAngeles, 75 Cal. App. 4th 68 (1999).
[13] Section 33607.5(c), which applies to redevelopment project areas that either (1) are adopted on or after January 1, 1994, or (2) acquire new territory by amendment after that date (see § 33607.5(a)(1)), provides:
 (c) Commencing with the 11th fiscal year in which the agency receives tax increments and continuing through the last fiscal year in which the agency receives tax increments, a redevelopment agency shall pay to the affected taxing entities, other than the community which has adopted the project, in addition to the amounts paid pursuant to subdivision (b) and after deducting the amount allocated to the Low and Moderate Income Housing Fund, an amount equal to 21 percent of the portion of tax increments received by the agency, which shall be calculated by applying the tax rate against the amount of assessed value by which the current year assessed value exceeds the first adjusted base year assessed value. The first adjusted base year assessed value is the assessed value of the project area in the 10th fiscal year in which the agency receives tax increment revenues.
[14] Section 33607.5(d), which also applies to redevelopment project areas that either (1) are adopted on or after January 1, 1994, or (2) acquire new territory by amendment after that date (see § 33607.5(a)(1)), provides:
 (d) Commencing with the 31st fiscal year in which the agency receives tax increments and continuing through the last fiscal year in which the agency receives tax increments, a redevelopment agency shall pay to the affected taxing entities, other than the community which has adopted the project, in addition to the amounts paid pursuant to subdivisions (b) and (c) and after deducting the amount allocated to the Low and Moderate Income Housing Fund, an amount equal to 14 percent of the portion of tax increments received by the agency, which shall be calculated by applying the tax rate against the amount of assessed value by which the current year assessed value exceeds the second adjusted base year assessed value. The second adjusted base year assessed value is the assessed value of the project area in the 30th fiscal year in which the agency receives tax increments.
[15] Section 33607.7(b) refers to and incorporates several parts of section 33607.5, and applies to redevelopment project areas adopted priorto January 1, 1994, if the projects' redevelopment plans are thereafter amended in specified respects. (See § 33607.7(a).) Section 33607.7(b) provides:
 (b) If a redevelopment agency adopts an amendment that is governed by the provisions of this section, it shall pay to each affected taxing entity either of the following:
 (1) If an agreement exists that requires payments to the taxing entity, the amount required to be paid by an agreement between the agency and an affected taxing entity entered into prior to January 1, 1994.
 (2) If an agreement does not exist, the amounts required pursuant to subdivisions (b), (c), (d), and (e) of Section 33607.5, until termination of the redevelopment plan, calculated against the amount of assessed value by which the current year assessed value exceeds an adjusted base year assessed value. The amounts shall be allocated between property taxes and educational facilities according to the appropriate formula in paragraph (3) of subdivision (a) of Section 33607.5. In determining the applicable amount under Section 33607.5, the first fiscal year shall be the first fiscal year following the fiscal year in which the adjusted base year value is determined.
[16] E.g., Hassan v. Mercy Am. River Hosp., 31 Cal. 4th 709, 715
(2003); Esberg v. Union Oil Co., 28 Cal. 4th 262, 268 (2002); People v.Murphy, 25 Cal. 4th 136, 142 (2001); see also Civ. Code § 4.
[17] Curle v. Super. Ct., 24 Cal. 4th 1057, 1063 (2001); Garcia v.McCutchen, 16 Cal. 4th 469, 476 (1997); Kimmel v. Goland, 51 Cal. 3d 202,208-209 (1990); see also Civ. Code § 13.
[18] Cooley v. Super. Ct., 29 Cal. 4th 228, 249 (2002); Dix v. Super.Ct., 53 Cal. 3d 442, 459 (1991).
[19] Wells Fargo Bank v. Super. Ct., 53 Cal. 3d 1082, 1097 (1991).
[20] Hoechst Celanese Corp. v. Franchise Tax Bd., 25 Cal. 4th 508, 519
(2001) (internal citations omitted).
[21] Wilcox v. Birtwhistle, 21 Cal. 4th 973, 977-978 (1999); People v.Jenkins, 10 Cal. 4th 234, 246 (1995); see also Civ. Code § 3542.
[22] § 33607.5(a)(1). For such amended plans, the pass-through requirements and formulas apply only to "the tax increments from territory added by the amendment." Id.
[23] § 33607.5(a)(1).
[24] We note that the other multiplier to be applied under these provisions — namely, "the tax rate" — is not a subject of disagreement among the interested parties; hence, it is beyond the scope of this opinion.
[25] There is no significant difference of opinion among county auditors, taxing entities, and redevelopment agencies, we are told, with respect to the method for calculating tier-one pass-through payments under section 33607.5(b), meaning that there is general agreement among interested parties about how one determines "the tax increments received by [a redevelopment] agency" in a given fiscal year. Accordingly, no question is posed to us concerning tier-one pass-through calculations, and we discuss that subject only for purposes of context and comparison.
[26] People v. Athar, 36 Cal. 4th 396, 409 (2005) (quoted in Miklosyv. Regents of U. of Cal., 44 Cal. 4th 876, 896 (2009); see People v.Licas, 41 Cal. 4th 362, 367 (2007); In re Young, 32 Cal. 4th 900, 907
(2004). See also, e.g., People v. Trevino, 26 Cal. 4th 237, 242 (2001) ("When the Legislature uses materially different language in statutory provisions addressing the same subject or related subjects, the normal inference is that the Legislature intended a different meaning.").
[27] Silverbrand v. Co. of Los Angeles, 46 Cal. 4th 106, 126 (2009) (citing Smith v. Rae-Venter Law Group, 29 Cal. 4th 345, 364 (2002) (superseded on other grounds by statute).
[28] §§ 33607.5(c) and 33607.5(d) (emphasis added).
[29] § 33607.7(a) provides:
 This section shall apply to a redevelopment plan amendment for any redevelopment plans adopted prior to January 1, 1994, that increases the limitation on the number of dollars to be allocated to the redevelopment agency or that increases, or eliminates pursuant to paragraph (1) of subdivision (e) of Section 33333.6, the time limit on the establishing of loans, advances, and indebtedness established pursuant to paragraphs (1) and (2) of subdivision (a) of Section 33333.6, as those paragraphs read on December 31, 2001, or that lengthens the period during which the redevelopment plan is effective if the redevelopment plan being amended contains the provisions required by subdivision (b) of Section 33670. However, this section shall not apply to those redevelopment plans that add new territory.
[30] § 33607.7(b)(2) (emphasis added).
[31] § 33607.7(c).
[32] Cf. § 33607.5(b) ("tax increments received").
[33] As explained above, the Legislature expressly considers such differences in assessed value to represent only a "portion" of the tax increments received by the agency, making it clear that the two concepts are not synonymous.
[34] As with section 33607.5, the section 33607.7 formulas apply only after deduction of the amounts deposited in the Low and Moderate Income Housing Fund. § 33607.5(a)(1).
[35] Some interested parties argue that the original "tier one" multiplicand provided in section 33607.5(b) — namely, the agency's total "tax increments received" less any deposits in the Low and Moderate Income Housing Fund — should also figure into calculations of tier-one payments under sections 33607.7(b)(2) and 33607.7(c). In our view, such approaches lack foundation in the statute, and we reject them. We think that the Legislature would have provided clearer and more detailed statutory guidance if such multi-factor calculations had been intended. Moreover, we find nothing in the legislative history of section 33607.7 to suggest that such approaches were ever considered, much less intended.
[36] Cf. section 33607.5(a)(1) (applying pass-through formulas only to tax increments attributable to the annexed territory that triggered the agency's pass-through obligations).
[37] Again, the section 33607.7(b)(2) multiplicand is "the amount of assessed value by which the current year assessed value exceeds an adjusted base year assessed value." For first-tier payments, that "adjusted base year assessed value" is "the assessed value of the project area in the year in which the limitation being amended would have taken effect without the amendment," as provided in section 33607.7(c). See § 33607.5(b).
[38] For second-tier payments, the section 33607.7(b)(2) multiplicand is "the amount of assessed value by which the current year assessed value of the project area exceeds" the assessed value for the 10th fiscal year after the adjusted base year (i.e., after "the year in which the limitation being amended would have taken effect without the amendment"). See § 33607.5(c).
[39] For third-tier payments, the section 33607.7(b)(2) multiplicand is "the amount of assessed value by which the current year assessed value of the project area exceeds" the assessed value for the 30th fiscal year after the adjusted base year (i.e., after "the year in which the limitation being amended would have taken effect without the amendment"). See § 33607.5(d).
[40] § 33670(a). Virtually the same definition is repeated later in that provision with regard to redevelopment project territory that is subsequently (i.e. post-ordinance) added to a taxing entity by annexation or otherwise: "the assessment roll of the county last equalized on the effective date of the ordinance shall be used in determining the assessed valuation of the taxable property in the project on the effective date." Id.
[41] E.g., Community Development Com., 152 Cal. App. 4th at 1476
(county assessor "must assess all property subject to general property taxation at its full value . . . each year"); see Rev. Tax. Code §§110, 117, 128, 401, 401.3, 2192.
[42] We note that the same data source is used in calculating appropriate tax increment benchmarks for a redevelopment project.Redevelopment Agency, 75 Cal. App. 4th at 76-78 (quoting56 Ops.Cal.Atty.Gen. 184, 189 (1973)).
[43] Rev. Tax. Code section 601 provides that the county assessor "shall prepare an assessment role, as directed by the [Board of Equalization], in which shall be listed all property within the county which it is the assessor's duty to assess."
Rev. Tax. Code section 602 provides that "[t]his local roll shall show:"
 (a) The name and address, if known, of the assessee. The assessor is not required to maintain electronic mail addresses.
 (b) Land, by legal description.
 (c) A description of possessory interests sufficient to identify them.
 (d) Personal property. A failure to enumerate personal property in detail does not invalidate the assessment.
 (e) The assessed value of real estate, except improvements.
 (f) The assessed value of improvements on the real estate.
 (g) The assessed value of improvements assessed to any person other than the owner of the land.
 (h) The assessed value of possessory interests.
 (i) The assessed value of personal property, other than intangibles.
 (j) The revenue district in which each piece of property assessed is situated.
 (k) The total taxable value of all property assessed, exclusive of intangibles.
 (l) Any other things required by the board.
[44] Rev. Tax. § 2050.
[45] Id.
[46] Rev. Tax. section 109 provides:
 "Roll" means the entire assessment roll. The "secured roll" is that part of the roll containing State assessed property and property the taxes on which are a lien on real property sufficient, in the opinion of the assessor, to secure payment of the taxes. The remainder of the roll is the "unsecured roll." The "local roll" is those parts of the secured and unsecured roll containing property which it is the county assessor's duty to assess. The "board roll" is that part of the secured roll containing State assessed property.
[47] Rev. Tax. § 2052 (emphasis added).
[48] Rev. Tax. § 2055; see id. at §§ 1601 et seq.
[49] Rev. Tax. § 2053; see id. at §§ 1840, 1841.
[50] Rev. Tax. § 2053.
[51] Rev. Tax. § 2055; see also Redevelopment Agency,75 Cal. App. 4th 68, 76-78 (quoting 56 Ops.Cal.Atty.Gen. at 189)).
[52] Cf. Cal. Const., art. XVI, § 16. See also § 33670; RedevelopmentAgency, 75 Cal. App. 4th at 76-78. *Page 1